Nichols, Judge,
delivered tbe opinion of the court:
Plaintiffs herein claim just compensation under the Fifth Amendment for an alleged taking of their property by the United States. The property allegedly taken is the “excess profits” from the duty-free sale of private automobiles in Brazil by the plaintiffs pursuant to a diplomatic privilege. The commissioner found for the plaintiffs. We reverse.*
Plaintiffs are members of the U.S. Armed Forces who at the time of the transactions here involved were assigned to the Joint Brazil-United States Military Commission, (JBUSMC) in Bio de Janeiro, Brazil. Coincident with this assignment was the privilege afforded them as if they were diplomatic personnel, for duty-free importation of automobiles for personal use during the tour of duty. As a result of international Executive agreements, Brazilian law and the embassy regulations permitted the duty-free sale of automobiles so imported in certain enumerated circumstances. The most common occurrence which qualified a car for sale was the passage of two years following the date of importation. The prevailing market in Brazil was such that a sale would bring a price two or three times that originally paid for the car; obviously a considerable windfall for the seller. The findings show the scope of this business: U.S. personnel sold an average of one of these duty-free cars to a Brazilian buyer every working day, at profits of up to $3,000 per sale. Since the same car, if transported back to the United States would be worth only a fraction of its original cost, the practice was to sell the car on the Brazilian market upon completion of a tour of duty.
Similar conditions prevailed in other Latin American countries. Americans were able to recover these generous profits only by virtue of their diplomatic privilege, and the damage believed done to the American image by this “profiteering” became an object of serious concern to senior State Department officials. This concern took the form of action *386 after an incident involving two Foreign Service officers resulted in very unfavorable local publicity. See Finks v. United States, 184 Ct. Cl. 480, 395 F. 2d 999, cert. denied 393 U.S. 960 (1968). The action taken was a change in the regulations so that in order to take advantage of a duty-free sale, tbe seller had to agree to accept no more than his original cost plus expenses, with the excess going to a charity of his choice. It is this excess amount which plaintiffs charge was unconstitutionally taken.
At the time plaintiffs imported their automobiles into Brazil, Embassy Instruction 103 of May 11,1962 was the controlling directive, both for policy and procedure, in regards to duty-free importation and sale. The preamble to this directive set the tone for all such transactions and bears repeating here:
By Executive Order of the President, the Ambassador is charged with the responsibility of exercising full and complete control over the importation, use and disposition of all items, whether of great or small value, which are brought into the country duty-free by or on behalf of the United States citizen who is in Brazil and enjoys duty-free privileges because of his relationship to the United States Government. The Ambassador’s control extends to importations by the individual whether or not freight coste are covered by the Government, to the purchases made by and through liquor pools, Commissaries, Post Exchanges, and to items received through military postal facilities, diplomatic pouches and international mail, and to items brought in as accompanied or unaccompanied baggage and on US military aircraft and vessels.
All duty-free importations or purchases accomplished via any means must, without exception, be intended for the personal use of the individual concerned, and under no circumstances may a duty-free importation or purchase be accomplished with the intent on the part of the individual concerned to give, loan, sell or otherwise release such imported items to any person, persons or organization, or to allow the use of his name for such purpose. Sale may be authorized when related to a permanent departure from Brazil for which specific regulations are prescribed elsewhere in this Circular. Infractions of this basic rule of international usage can jeop *387 ardize our entire structure of privileges in the country and will be viewed as a serious breach, of discipline which the Ambassador could not possibly ignore.
At the present time there are over 1,200 Americans serving in Brazil representing various civilian and military Agencies of the United States Government. We are the largest single organization in the country which receives duty-free privileges for each American staff member. It is imperative that each and every individual, as a guest in Brazil, conduct himself in such a manner so as to be free from any breath of suspicion concerning improprieties hi any aspect of his life in Brazil, and particularly with regard to his duty-free privileges. The Brazilian Government is much concerned with this question and scrutinizes each and every duty-free importation so carefully that delays in clearance are inevitable. Our efforts to expedite and streamline the clearances have had limited success because of the Brazilian Government’s serious concern. The following rules and regulations, which shall be observed by each and every individual entitled to free-entry privüeges, are designed to inform all concerned of the procedures to be followed hi accomplishing duty-free purchases or importations, and to afford the Ambassador the means for the necessary control.
Paragraph Y (2) contained the following language in reference to JBUSMG personnel:
Civilian and military personnel attached or assigned to the Joint Brazil-United States Military Commission are eligible for the same duty-free privüeges and are subject to the same rules and regulations stipulated herein, and shall make ah applications for importations, purchases or disposals to the Secretary of the United States Delegation as prescribed by JBUSMC instruction.
JBUSMC Regulation 200-3 of 15 May 1963, was then published to implement Embassy Instruction 103. Paragraph 7c was entitled, Procedure For Selling Duty-Free Automobiles, and read, in part, as follows:
(1) Request for permission to sell an automobile will be submitted to the Senior Officer, Service concerned, through the Secretary, U.S. Delegation, JBUSMC * * *
*388 (2) The Secretary, * * *, will review the request and if it is determined that it meets the criteria for sales, as stated in these Regulations, he will forward it to the Senior Officer, service concerned, recommending approval,
(3) After approval by the Senior Officer, service concerned, the request will be returned to the Secretary, * * * , who will prepare and forward appropriate letters to the Brazilian authorities. Nothing contained in these Regulations will be deemed to prohibit the Senior Officer, service concerned, from disapproving a request even when the automobile meets all sales criteria of these Regulations.
(4) When approval is obtained from the Brazilian authorities, seller will be notified by the Secretary, U.S. Delegation, JBUSMC.
«í» *[•
Following notification of approval by Brazilian authorities, the seller was then free to find his own buyer.
Plaintiffs admit that prior to importing their vehicles, they were advised of the then existing laws and regulations of Brazil and the United States which governed the duty-free sale of such vehicles while in Brazil. Indeed, the message from the quoted documents is clear that such importation and sale was a privilege to be enjoyed only as it did not detract from the image of the United States mission to Brazil. Local Brazilian law granted the privilege of selling automobiles imported duty-free under certain express conditions. However, the exercise of this privilege was carefully controlled by the Ambassador. No American diplomatic personnel could directly approach the Brazilian officials for authority to sell. Permission had to be obtained from the proper American officials who, if approval were granted, would then clear the transaction with the Brazilians. That approval was generally granted as a matter of routine could not transform this privilege into a vested right. As evidenced by JBUSMC 200-3, the “Senior Officer, service concerned” could disapprove the request by the individual even though all the requirements of Brazilian law had been met. Even when sale was authorized, the manner of sale was likewise *389 subject to the control of tbe Ambassador. Embassy Instruction 103 directed that, “personnel shall avoid undignified sales practices such as auctions or ‘fire sale’ type of advertisement and in advertising, the employee shall not identify therein the United States Government or any Agency thereof.”
It is noteworthy that while these same policies and regulations were in effect, at least one member of JBUSMC was apparently denied permission to sell an automobile because his acknowledged motives for importing the car were not in keeping with the policy expressed in the preamble to Embassy Instruction 103, quoted sufra. Paragraph III 2(c) of this directive provided:
Vehicles in the country less than one year may not be sold except to duty-free persons, subject to Embassy and Ministry approval, or must be exported from Brazil. Exceptions to this rule are in the event of death of the employee/owner or retirement, with permanent departure from Brazil of the employee retiring from Government service. * * *
Citing this paragraph and his pending retirement, an Air Force enlisted man forwarded a request for authority to import a new car in November, 1964, and in the same document requested permission to sell it at his retirement in August, 1965. (DF Exhibit 58.) The response from the Embassy official charged with ruling on such a request was (DF Exhibit 59), as follows:
We have reviewed carefully your memorandum of August 12 and * * * attached request for the importation and later sale of an automobile.
Embassy Instruction No. 103 dated May 11,1962 states that “All duty-free importations or purchases accomplished via any means must, without exception, be intended for the individual concerned, and under no circumstances may a duty-free importation or purchase be accomplished with the intent on the part of the individual concerned to give, lend, sell or otherwise release such imported items to any person, persons, or organizations * * *”
It would appear from * * * application for import of a new automobile that his purpose is as much to have *390 a car to sell upon retirement as it is to have transportation for the balance of his tour here. Approval of * * * request would therefore be contrary to the letter and intent of Embassy 'Instruction No. 103.
[The applicant] appears to be eligible to import an automobile for his own use. Should he wish to import a car for the balance of his tour with the express understanding that he will not be authorized upon his departure to sell it, but must take it out of the country, he should submit a corrected application for our approval.
During cross-examination at the trial, one of the plaintiffs responded to questions regarding this incident with the statement that, “the honest, hardworking soldier who lays down the truth and honesty, he gets clobbered all the time. The big-time operator who is looking for all the angles, he gets away with murder all the time.”
The State Department, at the instance of the National Security Council, had since 1958, been devoting considerable study to these matters and their effects on the American image in the countries concerned. On September 1,1964, following the incident described in Finks, supra, William J. Crockett, Deputy Under Secretary of State for Administration, issued the following memorandum to various State Department officials:
In many countries United States Government employees are making enormous profits by selling their automobiles on the local economy. Not only do I find this unethical, but I believe it diminishes the stature of the American mission abroad.
We do not pay for the transportation of employee’s automobiles so that they may eventually take advantage of the economic plight of the host country. Profiteering never was intended to be a motive for duty abroad. Moreover, the situation is exacerbated in certain countries by the fact that employees of certain agencies can import cars while employees of other agencies cannot.
One solution would be to determine the countries where abnormal profits are being made and to authorize the Ambassador to forbid all Americcm Government emr ployees from selling their cars at the completion of a tour of duty. Another possibility would be to allow the *391 sale of tbe car at the U.S. book value taking into consideration higher cost of maintenance, etc. I personally favor the former solution although it admittedly would result in higher transportation costs per employee; the latter solution, while more economical to the Government, appears to be open to chicanery and circumvention.
A third possibility would be to require the excess profits to be turned into the Embassy. Some of these funds could be put back into local charities and schools and a portion could be put into an Embassy recreation fund.
Any comments?
On February 4, 1965, the State Department published Foreign Affairs Mamoal Circular No. 281 (FAMC 281) with the stated purpose:
* * * to prohibit the sale of personal automobiles, and other personal property, of American employees abroad at prices producing profits that result essentially from import privileges derived from their official status * * *.
This directive, applicable worldwide, prohibited the sale by diplomatic personnel, “at an amount in excess of the price he paid for it plus any taxes and customs paid by him, or for any valuable consideration in excess of the total of these amounts.”
Each Ambassador was given authority to issue “detailed local regulations and procedures tailored to meet unique local situations.”
These regulations, of course, had no effect on the local market, and if the Americans were not allowed to sell at a greater price than cost, evidently the Brazilian buyers would fall heir to the windfall profits. Such a situation would have been conducive to the “chicanery and circumvention” anticipated by Under Secretary Crockett, supra. An alternative was to require the employee to ship his car back to the United States at the conclusion of his tour of duty. However, in view of the inconvenience to the individual concerned and the fact that the cost of transportation was often greater than the value of the car on the American market, this latter alternative was considered undesirable.
*392 In order to avoid any of the consequences related above, Ambassador Lincoln Gordon, with the approval of the State Department, published Embassy Instruction No. 188 of May 20, 1965. Paragraph V of that directive was entitled, Conditions for Disposition of Vehicles in Brazil under FAMC 281, and read as follows:
A. Options
The owner of the vehicle imported free of duty has the following options in disposing of the vehicle
(1) Export the vehicle from Brazil, at government expense if eligible;
(2) 'Sell the vehicle * * * to another person enjoying duty-free privileges;
(3) Pay Brazilian duties and taxes, thus freeing the vehicle. for sale subject to approval of Brazilian authorities;
(4) Sale to the Foundation. The seller will receive only an amount consonant with the provisions of FAMC 281. In such a case the seller will be given a statement by the Foundation which will indicate the exact amount received;
(5) Sale through the Foundation. The seller will receive only an amount consonant with the provisions of FÁMC 281. He may designate, if he wishes, the charity to which any excess proceeds are to be paid. The seller will be given a statement by the buyer showing the full amount paid for the vehicle and he may be subject to the payment of a capital gains tax.
B. Foundation
(1) A charitable Foundation will be established to sell or facilitate the sale of vehicles owned by the U.S. Government employees enjoying duty-free privileges. The Embassy Automobile Board will administer the Foundation, establish the procedure for the sale of vehicles in accordance with the provisions of this instruction, and dispose of the funds received by the Foundation.
(2) Pending the legal establishment of a Foundation, the funds accruing to it from the sales of duty-free vehicles will be placed in escrow in an interest bearing account in a U.'S, bank.
*393 This instruction also provided that any seller exercising either option 4 or 5, “must deal directly with the Foundation”, and “must give the Foundation a quitclaim.” Instruction 188 had to be revised and option 3 deleted due to the unwillingness of Brazilian Customs to permit the uncontrolled sale of automobiles after payment of import duties. It is unnecessary to comment on the further revisions because there were no material changes pertinent to this discussion. All of the plaintiffs herein elected either the sale-to or sale-through option and since there are no significant differences between the two we will no longer make a distinction.
Mr. Paul H. Goodman, an American citizen residing in Brazil, was hired as the “Administrative Officer” of the Foundation. Principally, it was his job to negotiate sales under options 4 and '5 with Brazilian buyers. When a sale was negotiated the seller received a “formula price”. This price was found by our commissioner to be based, “not on the price shown on the sales invoice, but, where the seller paid the U.'S. excise tax, on the manufacturer’s New York domestic list price, plus all accessories, and, where the seller did not pay the excise tax, on the New York FAS list price, plus accessories. Beimbursement also included all sales or title taxes paid in the United States; such costs as marine insurance, preparation charges, customs fees, port charges, and dock handling; and all inland and overseas transportation costs.” The net effect of the transaction was that the employee, at the very least, had the use of a car in Brazil throughout his tour of duty absolutely without any cost for depreciation or obsolescence, though these, as we all know, are major components of the cost of operating a motor vehicle at home.
Each plaintiff made application to sell his car on Embassy Form No. 1, which contained the following language just above the signature:
I hereby choose Option No.-of my own free will. * * *.
I hereby renounce any claim against the U.S. Government, the Government of Brazil, the Embassy Automobile Board, or any person concerned with the *394 implementation of the regulations governing the sale of my car, except in the case of fraud or malfeasance.
Upon receipt of his “formula” sale price, each plaintiff executed Embassy Form No. 3, which contained the following:
I accept voluntarily the above dollar amount in cash (or check No._) which I understand to be consonant with provisions of FAMC 281 issued by the Secretary of 'State and Embassy Instruction 188, issued by the Deputy Chief of Mission with the approval of the Ambassador, and do hereby release, renounce and quit claim now and forever all and any further claims against the United States Government, the Embassy of the United States of America at Kio de Janeiro and all or any person or organizations connected with this sale.
The commissioner stated that the conditions thus imposed upon duty-free sales, “that plaintiffs property be, without just compensation, appropriated for charitable purposes, was constitutionally improper.” He then held that execution by plaintiffs of the required forms did not operate as a waiver or release because, “it is recognized in situations of this kind that agreements to accept the unconstitutional condition are executed under a form of duress.”
The commissioner’s conclusion presupposes that what plaintiffs surrendered was a constitutional right to make a duty-free sale. That simply is not the case here. As we said in Finks, 184 Ct. Cl. at 488, 395 F. 2d at 1003, “Diplomatic personnel do not have a right to sell their vehicles duty-free even if these conditions are fulfilled. Compliance with these time requirements will make a vehicle eligible for duty-free resale. Authorization for the sale is necessary before a resale qualifies. To obtain authorization, the Embassy must request permission from the Ministry. Both the Embassy and the Ministry might refuse to act.”
•It may be as plaintiffs contend that “defendant certainly was not legally free to act arbitrarily or capriciously in denying privileges to individuals who had met the established eligibility requirements.” However, plaintiffs have not shown any arbitrary or capricious action on the part of the defendant. On the contrary, the record shows clearly that *395 this action was taken only in pursuance of legitimate foreign policy goals and appeared reasonable under the circumstances.
It is not for this court to tell the Ambassador how to run his embassy. It is evident that many of us Americans have the urge to be entrepreneurs and it is well we do. Those who serve us abroad, though able and dedicated, are not per se entirely immune. It is evident that their possession and enjoyment of large quantities of luxury goods, brought to them tax and duty-free because of diplomatic immunities, in countries short of such articles but long on the love of them, makes for hazardous situations and perilous confrontations. The Ambassador has just as much the duty to enforce discipline in the premises, to keep anyone from making the danger greater, as' if he were in command of a ship in a typhoon. He may make mistakes: few of us would always be right if in his shoes, but in doing what is clearly his duty he is not to be second-guessed or have to suffer this court’s peering over his shoulder. Thus it is not a proper subject of our inquiry whether, as plaintiffs urge, the measures adopted really did the Brazilians no good, or whether the administrative details of the procedure (e.g., as to tax liability) were properly worked out. “They cannot be characterized as unauthorized merely because they may have been mistaken, imprudent, or wrongful.” See, Eyherabide v. United States, 170 Ct. Cl. 598, 606, 345 F. 2d 565, 570 (1965).
From all the foregoing it is evident that the Ambassador had the right to regulate these sales and even prohibit them altogether if he thought it in the interest of better relations with Brazil to do so. Plaintiffs’ counsel admitted as much in open court. Indeed, plaintiffs must urge and not deny this authority in the Ambassador or else they would not allege a cause of action under the Fifth Amendment. Royal Holland Lloyd v. United States, 73 Ct. Cl. 722, 732 (1932).
The defendant properly refers us to the cited case, which illustrates neatly the principles involved, as well as the willingness of our predecessors to draw fine distinctions. It came before us under a special jurisdictional act construed as authorizing an award under international law as well as under *396 the Fifth. Amendment. The facts were these: during this nation’s participation in World War I, a Dutch merchant vessel put into New York in course of a voyage home from South America. The Collector of Customs prevented her departure for some six months by refusing a clearance. He did this primarily to maintain her availability for requisitioning for U.S. war needs, but it was lawless, this court held, the duty to clear promptly on request a friendly foreign vessel for a lawful departure being mandatory. Eventually, the ship was formally requisitioned and proper compensation paid. The only issue was compensation for costs and losses to the owners during the previous period of detention. The possibility of back-dating the requisition is not mentioned and apparently was not urged or considered, so the problem as dealt with would not have been different if the vessel had been allowed to depart at the end of the six months. This court held that the utter lack of authority for the Collector’s withholding clearance precluded liability of the United States under domestic law, but we made the owners an award under international law, wherein the obligation to pay just compensation was not dependent on the taking being lawful.
Plaintiffs’ astute counsel is thus well aware of his dilemma, which is that for them to prevail, the Ambassador’s action must be rightful and wrongful at the same time, and wrongful only in the particular of withholding just compensation lawfully due. Plaintiffs argue that the issue here is not the Ambassador’s right to regulate or even prohibit a duty-free sale, but rather their alleged Fifth Amendment right to keep the entire fund resulting after such sales were properly authorized and consummated. But of course it is evident that the owner of property taken can agree with the taker on how he is to be compensated. We find that plaintiffs bargained away their compensation in excess of the amount agreed, to in return for the privilege of making the sale at all. As noted above, the commissioner found that the plaintiffs assented to these conditions only under duress, because “as a practical matter there was no real choice because the cars were worth *397 in the United States only a fraction of what they could obtain in Brazil even under the restricted formula price program.” Thus the Ambassador’s alleged wrong was in making it financially more attractive for plaintiffs to do what he wanted them to than it would have been to do otherwise. This is not a case where plaintiffs’ dilemma is the result of any real wrongdoing by the representatives of the Government. In Fruhauf Southwest Garment Co. v. United States, 126 Ct. Cl. 51, 62, 111 F. Supp. 945, 951 (1953), we noted, “It has become settled law that the mere stress of business conditions will not constitute duress where the defendant was not responsible for those circumstances.” The question of coercion and duress by the Government has been presented to this court many times. In Fruhauf, 126 Ct. Cl. at 62, 111 F. Supp. at 951, we stated guidelines that have been frequently quoted in subsequent opinions. We think it appropriate to quote them again:
The law of duress has broadened somewhat during recent years making it virtually impossible to arrive at any clear-cut definition, and the courts have stated that its application must of necessity depend upon the circumstances of each individual case. * * *. An examination of the cases, however, makes it clear that three elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. * * *. In order to substantiate the allegation of economic duress or business compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress must be proven to have been the result of the defendant’s conduct and not by the plaintiff’s necessities. * * *
In Aircraft Assoc. v. United States, 174 Ct. Cl. 886, 896, 357 F. 2d 373, 378 (1966), although there finding duress, we cited Fruhauf, supra, with approval and noted that, “if the Government’s wrongful actions had not caused or contributed to plaintiff’s financial difficulties, the exaction of a release from *398 plaintiff under a threat to exercise the Government’s contractual right would not vitiate the release on the ground of duress.”
The Fruhauf standard is cited with approval more recently in Urban Plumbing & Heating Co. v. United States, 187 Ct. Cl. 15, 408 F. 2d 382 (1969), where duress was found; and Inland Emp. Bldrs., Ino. v. United States, 191 Ct. Cl. 742, 424 F. 2d 1370 (1970), where plaintiff’s claim of duress was rejected. In Urban Plumbing & Heating Co., Government caused delays of 69 days put plaintiff in mere technical default on a contract for modification of a heating and power plant in Alaska. The Government threatened a termination for default, which if done would have been wrongful. Alternatively it demanded that plaintiff choose between a 69 day extension without more, which was meaningless because winter conditions then prevented any work, or a 245 day extension with a stipulation that there would be no change in the contract price. We found that this waiver of a price increase was obtained under circumstances constituting coercion and duress. In Inland Emf. Bldrs., Ino., plaintiffs had valid claims for additional compensation on a contract, but feared that any delays caused by presentation of such would subject them to substantial interest charges. Consequently, they executed unconditional releases when called upon to do so. They were held bound by the releases on a subsequent presentation of the claims. Accord, Adler Const. Co. v. United States, 191 Ct. Cl. 607, 423 F. 2d 1362 (1970).
The Ambassador, in Embassy instruction 103, had made his authority m this matter quite plain. Plaintiffs never had any reason to believe that the policy expressed in that directive would not be enforced. With full knowledge that the Ambassador could require them to return their vehicles to the United States, plaintiffs brought them to Brazil, hopeful of a tidy profit. For reasons of policy it became necessary to eliminate or mitigate the image of profiteering. Eather than enforce his right to require exportation, the Ambassador offered to allow plaintiffs to sell their cars in Brazil at a reduced profit, in return for their release of claims. His stance was not wrongful. Plaintiffs accepted this offer and now *399 they are bound by it. The compensation they agreed to take was not all they now say they want, but was far above confiscation and was no mere derisory figure. As to what plaintiffs’ status might be had they chosen to export their cars and then bring this suit, we offer no comment.
In holding that plaintiffs’ claim for just compensation has been settled and is not properly in litigation, we do not wish to be understood as holding that takings occurred. We pre-termit that issue. Quaere, too, whether the taking if there was one was “for public use” in the Fifth Amendment terminology. Bee Finding 50. We hold that plaintiffs entered into an accord and satisfaction with the defendant, whereby all claims valid or invalid, for extra compensation, resulting from the duty-free sales of their automobiles at the “formula price”, were effectively released. It follows that in this suit plaintiffs are not entitled to recover and the petition is dismissed.
BINDINGS OK PACT
The court having considered the evidence, the report of Trial Commissioner Saul E. Gamer, and the briefs and arguments of counsel, makes findings of fact as follows:
1. All fifteen plaintiffs are citizens of the United States. During the events which gave rise to this suit, they were serving in one of the components of the United States Armed Services and were stationed in Eio de Janeiro, Brazil, as members of the United States Delegation to the Joint Brazil-United States Military Commission (hereinafter referred to as the “Commission” or as “JBUSMC”). JBUSMC was originally established by the two governments in Eio de Janeiro during World War II as a means of achieving their common goal of mutual security and was continued indefinitely by an Executive agreement signed in 1955. By the terms of such agreement, JBUSMC was to function as the principal agency in Brazil for facilitating military cooperation between the two countries.
2. (a) As a result of reciprocal, bilateral Executive agreements between Brazil and the United States, Commission members, as well as other Government personnel (herein *400 sometimes referred to as “diplomatic personnel”), were, because of their relationship with the United States Government, accorded the diplomatic privilege of importing their automobiles into Brazil free of Brazilian customs duties.
(b) These agreements provided that an automobile was permitted into Brazil duty free only for the purpose of personal use of diplomatic personnel while stationed in that country. The Executive agreement, entitled “Reciprocal Customs Privileges For Foreign Service Personnel,” in stating this policy, reads in part:
* * * the United States of America is disposed to conclude an agreement by means of an exchange of notes, based on the principle of strict reciprocity, which would permit career and other personnel of the United States of America attached to the Embassy and accredited consular offices in Brazil, who are nationals of the former country, and Brazilian career and other personnel attached to the Embassy and accredited consular offices in the United States of America, who are Brazilian nationals, to import, free from the payment of duties, in the countries m which they reside, any and all articles for their personal use, if they are not engaged in another occupation for the purpose of gain * * *.
3. Under an Executive order applicable to all Ambassadors, the United States Ambassador to Brazil was charged with the complete responsibility of controlling the importation, use, and disposition of all items brought into Brazil duty free by United States citizens because of their relationship with the United States Government. The Ambassador’s control extended to such importations by diplomatic personnel whether or not freight costs were defrayed by the Government.
4. In order to obtain a duty-free automobile import permit, each plaintiff had to submit a written request for Commission approval. If such approval was granted, the Commission would obtain the necessary clearance from the appropriate Brazilian Consular Office. Such Office would then notify the Brazilian Ministry of Foreign Affairs, which would subsequently authorize the appropriate Brazilian Consulate in the United States to issue the permit.
*401 5. (a) The bilateral Executive agreements providing for duty-free importation of automobiles did not, however, govern the matter of duty-free resales in Brazil. Such duty-free resales were, instead, provided for by the Brazilian domestic laws, which, at the time plaintiffs imported their automobiles, permitted such sales under the following conditions:
(1) After the vehicle had been in Brazil for two years;
(2) After the vehicle had been in Brazil for one year if the owner was transferred from Brazil;
(3) If the owner retired and returned permanently to his own country;
(4) If the owner died;
(5) If the vehicle was seriously damaged.
(b) These conditions were incorporated in a comprehensive set of regulations contained in Embassy Circular Instruction No. 103, issued May 11,1962, as the basis of criteria determining eligibility for a duty-free automobile sale by diplomatic personnel. The Embassy Instruction, entitled “Importation, Use and Disposition of Duty-Free Items,” set forth the rules and policies relating to the Ambassador’s “full and complete control over the importation, use and disposition of all items, whether of great or small value, which are brought into the country duty-free by or on behalf of the United States citizen who is in Brazil and enjoys duty-free privileges because of his relationship to the United States Government.” It contained a list of “Critical Items” and provided that “an item so classified is subject to control * * *.” It explained that an item was considered to be of a critical nature “usually because of local unavailability or resale value disproportionate to the duty-free price” and therefore was “subject to restrictions by Brazilian law.” Included in the list were “Vehicles.” No duty-free item on the critical list could be sold without the approval of the Embassy. The Embassy Instruction further provided that personnel attached to JBUSMC “are eligible for the same duty-free privileges, and are subject to the same rules and regulations” as those applicable to other Government personnel in Brazil “and shall make all applications for importations, purchases or disposals to the Secretary of the United States Delegation as prescribed by JBUSMC *402 instruction.” The conditions also formed the basis for vehicle eligibility for a duty-free sale in JBUSMC Kegulation No. 200-8, issued May 15,1963, and in effect at the time plaintiffs imported their automobiles into Brazil.
6. (a) Under the prescribed procedure for effecting a duty-free sale, persons not associated with the Commission were required to complete a form, on the basis of which an Embassy official would request authorization from the Brazilian Ministry of Foreign Affairs. If the Ministry approved the sale, the Embassy would then, provided it too approved the sale, obtain the required clearance from the Brazilian Customs Authorities.
(b) The aforesaid Commission Regulation No. 200-3 provided the procedure for persons associated with the Commission which was in effect at the time plaintiffs imported their automobiles. First, a written request on a standard form was submitted to the Secretary of the United States Delegation to the Commission. If the Secretary determined that the request met the criteria for sale, he forwarded it to the Senior Officer of the particular branch of the Service to which the applicant was attached, recommending approval. If approved by the Senior Officer, the request was returned to the Secretary, who then notified the proper Brazilian Authorities. Notification entailed transmitting the request to the President of the Commission, who was always a Brazilian. If he approved the request, the Commission would seek authorization for the sale from the Brazilian Customs. Once approval was obtained from the appropriate Brazilian Customs officials, the owner of the automobile would find a buyer and sell it directly to him.
(c) Regulation No. 200-3 further provided that:
* * * Nothing contained in these Regulations will be deemed to prohibit the Senior Officer, Service concerned, ■from disapproving a request even when the automobile meets all sales criteria of these Regulations.
7. At the time plaintiffs imported their automobiles, if a duty-free sale was approved and transacted under the described procedure, the seller was permitted to sell the auto *403 mobile at the prevailing local market price and retain the full proceeds of the sale. Embassy Instruction No. 103 did provide, however, that
[i]n accomplishing such sales * * * personnel shall avoid undignified sales practices such as auctions or “fire sale” type of advertisement and, in advertising, the employee shall not identify therein the United States Government or any Agency thereof.
8. (a) Each of the plaintiffs owned the automobile giving rise to bis claim herein, and each plaintiff imported his automobile into Brazil free of customs duties in accordance with all existing laws and regulations.
(b) Each plaintiff had been advised beforehand of the then existing laws and regulations of both the United States and Brazil governing a duty-free sale of such vehicles in Brazil.
9. (a) The sale, at prices substantially above original cost, of personal automobiles by American employees stationed 'in certain overseas posts has been considered a significant problem by the United States Government for a number of years.
(b) In April 1958, the Operations Coordinating Board (hereinafter referred to as the “OCB”), an interagency group established in the Executive Office of the President and placed under the jurisdiction of the National Security Council, submitted a report entitled “United States Employees Overseas” to the National Security Council. The report was prepared in response to a National Security Council 1957 instruction that the OCB review (a) existing agency practices “having a bearing on foreign attitudes toward U.S. citizens stationed abroad in certain countries selected as potential trouble spots,” and (b) “specific actions designed to improve these foreign attitudes.” The report, in a separate section entitled “General World-Wide Administrative Practices And Policies To Improve Foreign Attitudes Toward U.S. Personnel Overseas,” presented the results of a detailed examination of the practices of the agencies having the preponderance of United States employees abroad, i.e., the Defense and State Departments, the United States Information Agency, and the International Cooperation Administration. Practices con *404 cerning “six main areas” were discussed, one of which was set forth as follows: UU.S. Vehicles. The impact on host countries of large numbers of American-built and operated vehicles has been of such magnitude as to warrant discussion in a separate section.” In the section dealing with such automobiles, the report examined various factors creating “irritation and friction” with the citizens of the host countries. The report stated in part as follows:
Finally, in certain parts of the world the sale of American automobiles prior to the departure of the employee from the area has resulted in excessive profits. In this latter area, the three agencies are studying a possible policy statement defining a “fair price” for American vehicles and restricting the sales of such vehicles in foreign countries to such price.
(c) In a section of the report captioned “Disposal of Personal Property,” it was recommended that an interagency ad hoc committee be created to establish guidelines which could be used by the Chiefs of Mission in foreign countries in the development of uniform regulations for the disposal abroad of United States employees’ personal property. In commenting on this recommendation, the report stated:
This recommendation applies, to a most difficult and complex area of personal activity which has not been systematically, reviewed by all agencies concerned. In developing guides the ad hoc committee should consider, among other things, means to ensure that sales or disposal of personal property be made (a) in accordance with the laws and regulations of the host country, (b) in a manner which will not bring discredit on the United States or reflect unfavorably on the individual concerned or the organization to which he is attached, and (c) under regulations which, to the extent permitted by local law, will apply uniformly to all U.S. personnel in each country. The guides, will be sent to the Chief of each U.S. diplomatic mission for his use in developing jointly with representatives of other agencies having personnel in the country the uniform regulations appropriate for that country.
10. By memorandum of May 21,1958, the Department of State forwarded the OCB report to all Embassies for their *405 “information, guidance and appropriate action.” The memorandum stated tbat
The President has stressed Ms view of the importance of strengthening good personal relations between foreign nationals and Americans who live and work abroad. The President also underscored his desire that the chief of mission in each country assume special responsibility in carrying out the recommendations of the report in the field.
In a message dated October 81,1958, the Department of State forwarded to all American Diplomatic Posts another OCB document, dated October 1,1958, entitled “Guides for Use in Developing Uniform Regulations for a Particular Foreign Country Relative to the Importation and Disposal of Personal Property, the Acquisition and Conversion of Local Currency and the Importation, Operation and Disposal of Motor Vehicles.” The portion of the document containing the “Guides Pertaining to Personal Property” provided, among other things, that appropriate advance approval should be obtained for importation of items of high resale value, as well as for the sale of personal property to other than Government personnel. The portion containing the “Guides Pertaining to Motor Vehicles” provided, among other things, that
Sale of imported automobiles shall be limited to one per employee at a post except in circumstances which can be justified to and approved by the designated control authority.
No other specific form of controls was suggested, the document simply stating that
Each Ambassador is responsible for the development of regulations and procedures embodying these guides which will apply to all U.S. personnel and their dependents assigned or attached to diplomatic and consular offices in the country to which he is accredited.
The memorandum transmitting the “Guides” document reiterated that each Ambassador was responsible for the development of regulations and procedures embodying the guidelines.
*406 The “Guides” liad been formulated by an ad lioc committee composed of representatives of the Departments of State, Treasury, and Defense, and the Agency for International Development. They were approved by the OCB on September 24,1958.
11. (a) In July 1959, another OCB report, entitled “United States Personnel Overseas,” was issued. This report reviewed the status (as of March 31, 1959) of agency and field actions on the recommendations contained in the April 1958 OCB report. It noted that response to the guidelines from the Embassies, in the form of adopting appropriate regulations, had been slow and that only 30 percent of the Embassies had “developed regulations completely responsive to the OCB Directive, with regard both to achievement of policy objectives and to comprehensive procedure.”
(b) In a letter forwarding the July 1959 OCB report to all Diplomatic 'and Consular Posts, the Acting Secretary of State, on August 28,1959, advised as follows:
The Department emphasizes the importance it attaches to this Beport. The problem of enhancing the American presence abroad is one of gravest concern throughout the Government and the United States. Careful study of the [Report and unceasing efforts to carry out its recommendations can contribute immeasurably to the furthering of United States national policy objectives.
The report was accompanied by a Presidential letter dated July 29, 1959, which stated: “The head of each department and agency, chiefs of mission, commanders of unified commands and other senior representatives overseas are asked to give this matter their continuing personal attention and leadership.”
12. The April 3,1961 Department of State Foreign Affairs Manual contained provisions which emphasized the requirement that Diplomatic Missions, in furtherance of their obligations to develop appropriate regulations regarding economic and financial conduct of American employees, should pay particular attention to the need for regulations concerning, inter alia, the “importation, operation and disposal of *407 motor vehicles.” Section 626.2-2 of the Manual gave certain suggestions as to how to control the importation and sale of personal property. One suggestion was to require “all employees to report all proposed sales of personal property and to obtain prior approval. If the proposed sale or method of sale is not justified, permission to sell is denied.” The establishment of committees to evaluate requests for free entry and for sales was suggested, as well as the development and publication of standards “based on ethics, the local laws, regulations of the Department, et'c.” for the approval of such requests. Pursuant to the foregoing directives, the various Embassies promulgated regulations concerning the disposition of personal property, including automobiles. For example, the Embassy at Mexico City, which was cited in the 1959 OCB report as an example of outstanding compliance with its guidelines, issued on March 28,1962, its Circular No. 211 setting forth certain regulations concerning the importation and sale of personally owned automobiles, including the requirement of permission by the Embassy for the sale in Mexico of vehicles. The preamble to such regulation, which imposed restrictions on the frequency with which employees couild sell their automobiles, stated in pertinent part as follows:
The United States Government expects its employees abroad to maintain standards of behavior which will not bring discredit to the United States nor draw criticism from the local community in which they are regarded as representatives of the United States. The sale abroad of automobiles by U.S. Government personnel has so often led to widespread criticism that it has been necessary for policies to be established at the highest level of Government to prevent abuses in this field.
The Circular established an Embassy Car Board of Embassy officials to pass upon difficult cases. In a subsequent regulation dealing with personal property in general, the Embassy provided, on April 3, 1963, that such property could be sold under certain conditions, but that such sales “shall be made at a fair price, without profiteering or the appearance of profiteering.”
*408 13. (a) In 1964 the State Department became specially concerned with what it considered to be the problem of excessive profits resulting from sales of private vehicles by Government employees which existed in certain areas of Latin America. The problem in Brazil received special attention. On August 4, 1964, the American Consulate in Recife, Brazil, sent a telegram to the State Department reporting that the local press featured an article concerning an altercation between two employees of the Agency for International Development and a Brazilian national over an alleged breach of a contract for the duty-free sale of their automobiles to the Brazilian.[1] The automobiles involved were imported under the same regulations in effect at the time of the importation of plaintiffs’ automobiles. The State Department was concerned about the case principally because of the damage to the United States image in Brazil.
(b) On August 17, 1964, Covey T. Oliver, Ambassador to Colombia, wrote to William J. Crockett, Deputy Under Secretary for Administration of the State Department, to express his disapproval of excessive profit-taking in Colombia. He stated that££ [a] utomobile resale profits in Colombia are enormous.” He felt that “uniform basic rules and an appropriate delegation of subordinate rule-making and decision-making authority” were necessary; that “[importations of automobiles and other items commanding high internal prices * * * are not to be thought of as normal, free enterprise business operations but as Government-related operations”; that “[a]bnormal profits (by ordinary U.S. standards) should, therefore, not go to the seller. Rather, they should be used for purposes of official interest to the United States,” such as “the well-being and happiness of Mission clerical personnel [who had no automobile import privilege in Colombia].”
(c) At or about the time Mr. Crockett received Ambassador Oliver’s letter, he had conversations concerning the same matter with other Ambassadors, including Ralph A. Dun- *409 gan, Ambassador to Chile, and Lincoln Gordon, Ambassador to Brazil. Botb Ambassador Dungan and Ambassador Gordon agreed that charges of profiteering through sales of automobiles imported under diplomatic privileges were resulting in an unfavorable reflection upon the United States image abroad.
14. (a) As a result of these developments, Mr. Crockett, on September 1, 1964, issued the following memorandum to the executive directors of the five bureaus responsible for administrative problems in all State Department missions throughout the world:
In many countries United States Government employees are making enormous 'profits 'by selling their automobiles on the local economy. Not only do I find this unethical, but I believe it diminishes the stature of the American mission abroad.
We do not pay for the transportation of employees’ automobiles so that they may eventually take advantage of the economic plight of the host country. Profiteering never was intended to be a motive for duty abroad. Moreover, the situation is exacerbated in certain countries by the fact that employees of certain agencies can import cars while employees of other agencies cannot.
One solution would be to determine the countries where abnormal profits are being made and to authorize the Ambassador to forbid all American Government employees from selling their cars at the completion of a tour of duty. Another possibility would be to allow ■the sale of the car at the U.S. book value taking into consideration higher cost of maintenance, etc. I personally favor the former solution although it admittedly would result in higher transportation costs per employee; the latter solution, while more economical to the Government, appears to be open to chicanery and circumvention.
A third possibility would be to require the excess profits to be turned into the Embassy. Some of these funds would be put back into local charities and schools and a portion could be put into an Embassy recreation fund.
Any comments ?
The memorandum was also addressed to the Assistant Secretary of State for Administration, the Assistant Director of *410 the United States Information Agency (USIA), and the Assistant Administrator of the Agency for International Development (AID), among others. In addition, Mr. Crockett directed the Office of the Assistant Secretary of State for Administration to develop, in coordination with AID, USIA, and the Department of Defense, an appropriate regulation with respect to the problem.
(b) By memorandum of September 11, 1961, USIA responded that it agreed “U.S. Government employees should not be permitted to sell automobiles on the local economy at enormous profits to themselves,” but that a “world-wide procedure would seem to be difficult to prescribe, in view of the considerable variation which exists from country to country on such matters as the impact on local economies, the American image, or local requirements governing import and sale.” USIA also questioned the advisability of a “world-wide policy of mandatory export,” which would not only be a burden on Departmental appropriations but also would raise questions concerning “the use of taxpayers’ dollars to ship a car worth only a fraction of the shipping costs,” and further stated that “* * * a general policy of limiting sales to blue book values or requiring charitable donations in excess profits would be subject to a number of interpretations. ”
15. The problem also became a matter of congressional interest at the same time. In December 1964, the Subcommittee on Foreign Operations and Government Information of the House Committee on Government Operations requested the State Department to furnish a list of problem countries where its employees could sell their automobiles for amounts in excess of the prices originally paid, together with a description of the limitations imposed by the host country on the entry of personally owned automobiles of State Department employees.
16. In part to supply the House Subcommittee with the desired information, the State Department initiated a survey to determine the countries where its employees could sell their personally owned automobiles for amounts in excess of the prices they had paid. The results indicated that there were several countries in which such excess was substantial. One of *411 the chief problem areas was South America. The following figures represent the highest profit (defined as the amount received in excess of the original purchase price) realized on the last group of sales prior to the reporting date in December 1964: Brazil, $3,756;[2] Chile, $8,194;[3] Argentina, $7,000;[4] United Arab Republic, $4,058;[5] Uruguay, $4,767;[6] Cambodia, $4,168;[7] Korea, $7,161;[8] Colombia, $7,600.[9] The survey indicated that in Brazil an American-made car two years old could generally be sold for at least twice its original purchase price.
17. On January 1, 1965, the American Embassy at Rio de Janeiro issued Embassy Instruction No. 181, entitled “Transportation, Use and Sale of Personally-Owned Motor Vehicles.” Its stated purpose was the establishment of policies to prevent abuses in the sale abroad of automobiles by Government personnel leading to criticism and the bringing of discredit to the United States. Among other things, the instruction forbade (a) the importation of an automobile exceeding the manufacturer’s list price of $3,000 (not including excise taxes or optional accessories); (b) the “receipt of funds, advances, deposits or anything of value from local sources for the purchase of vehicles * * * if this involves ownership, use or control in any degree by the one furnishing the funds or if it involves in any maimer a promise or obligation, express or implied, to grant, give, sell, convey or release the vehicle at any time to the one supplying the funds * * and (c) the receipt of anything of value from local sources, or any consideration, for any vehicle “other than a fair market price.” The instruction set forth the procedure for obtaining permission to import vehicles, as well as rules for their use in Brazil (the obtaining of driving permits and insurance, and *412 the observation of local traffic regulations). As to the “Sale of Automobiles in Brazil,” the Instruction provided:
A. The sale of an automobile imported free of duty is a privilege and not a right.
B. No vehicle may be sold except with the express approval of (1) the Embassy (or JBUSMC when applicable) and (2) the Brazilian Government (Ministry of Foreign Affairs or Brazilian Military Authorities in case of JBUSMC Personnel).
The Instruction further set forth (a) the Brazilian Government Regulations for the sale of duty-free automobiles (including the two-year rule); (b) the Embassy Regulations (including the requirement that no negotiations for the sale of a vehicle could take place until the application was approved by the Embassy and transmitted to the Brazilian Authorities for their approval); and (c) the procedure to be followed (both by regular United States employees and JBUSMC personnel) in applying for the sale of duty-free vehicles. Finally, the instruction created a six-member Embassy Automobile Board, consisting of the following officials:
The Counselor for Administration, Chairman
The Counselor for Economic Affairs
The Counselor for Public Affairs
The Executive Officer of AID
The Air Attache
The Secretary of the U.S. Delegation, JBUSMC
The duties of the Board included (a) the approval of import applications where an individual had already had two duty-free vehicle importations and sales; (b) the approval, in cases of retirement, of all applications to sell a duty-free vehicle; (c) deciding appeals by employees; and (d) granting exemptions from the requirement that vehicle sales in Brazil must be completed prior to the owner’s final departure.
18. Upon the completion of the above-mentioned survey, the Office of Management under the Assistant Secretary of State for Administration drafted a worldwide regulation relating to the automobile problem. Drafts of the regulation *413 were circulated to AID, USIA, and the Department of Defense in accordance with Mr. Crockett’s instructions. All of these agencies approved the proposed regulation, and on J anuary 25, 1965, it was submitted to Mr. Crockett for his approval. The regulation, entitled “Importation and Sale of Personal Automobiles and Other Personal Property Abroad,” was thereafter issued on February 4, 1965, to become effective on March 1,1965, as Foreign Affairs Manual Circular No. 281 (hereinafter referred to as “FAMC 281”).
19. FAMC 281 contained the following pertinent provisions:
Paragraph 1 stated the purpose of the new regulation, as follows:
The purpose of this circular is to prohibit the sale of personal automobiles, and other personal property, of American employees abroad at prices producing profits that result essentially from import privileges derived from their official status as employees of the United States Government. Its provisions apply to all American employees, regardless of agency, attached to United States embassies and constituent posts.
Paragraph 2 gave the following background for the Circular:
The sale of personal property, particularly automobiles, abroad by American employees has, in certain instances, come under strong criticism because of profits the sellers have realized on the transactions. Profit-taking on sales of this kind diminishes the stature of the American mission? damages the United States image abroad, and results m undue personal advantages under circumstances created in substantial part by reason of official Government service to which special customs and import privileges are attached.
Paragraph 3, headed “Policy,” provided that the importation and sale of automobiles must be “in accordance with the laws, regulations and conventions of the host country”; that such automobiles should be “unostentatious in appearance and modestly equipped;” and that automobiles were to be imported only for “bona fide personal use” and “not with intent *414 of sale or transfer.” With, respect to the sale price, Paragraph 3(d) stated:
The employee will not be permitted to sell his personal property, including motor vehicles, at an amount in excess of the price he paid for it plus any taxes and customs paid by him, or for any valuable consideration in excess of the total of these amounts. However, an employee need not sell his personal property, including motor vehicles; he may export it, at his own or United States Government expense, under pertinent travel or shipping regulations. He must export it if required to do so by local law, local government regulation, or rules established by the ambassador.
Paragraph 4 provided that the Ambassador was charged with full responsibility for controlling the importation and sale of personal property, and that he was required to “issue and ensure compliance with local regulations consistent with” the policy set forth in the Circular.
Paragraph 5 provided that since conditions varied widely from country to country, the local regulations issued by the individual Ambassadors would be “tailored to meet unique local situations,” and that certain alternatives were available to the Ambassadors, such as limiting or prohibiting the importation of certain kinds of property, including motor vehicles, limiting the classes of persons to whom sales could be made, or requiring the exportation of the property.
20. On February 25,1965, the Embassy in Eio de Janeiro issued Embassy Instruction No. 183, headed “Importation and Sale of Personal Automobile,” which was applicable to all civilian and military personnel who were United States citizens and employees of the United States Government in Brazil. The Instruction attached FAMC 281 and made the regulations effective as of March 1, 1965. The Instruction continued, as follows:
The Embassy Automobile Board has approved the following:
1. Cars which became eligible for sale under the two-year rule on or before February 28, 1965 will not be affected.
*415 2. Cars approved and cleared by Brazilian authorities for sale on or before February 28, 1965 under the one-year rule because of the owner’s transfer from Brazil will not be affected.
AH other persons whose cars do not qualify for sale as of February 28,1965 will have the choice of taking their cars with them on their departure from Brazil or of selling them under the new arrangements being developed by the Automobile Board and which will be announced later.
21. The Ambassador to Brazil, Lincoln Gordon, immediately requested the Embassy Automobile Board to prepare new regulations to implement FAMC 281. However, certain problems arose in connection therewith, and Ambassador Gordon sent a cablegram to the State Department, dated March 19,1965, in which he made certain comments upon and suggestions relating to FAMC 281. For one thing, he felt that it was not advisable to permit, as the Circular did, direct negotiation and sale between seHer and buyer if the seller elected to dispose of his automobile in Brazil. The cablegram stated that the problem was not a small one in Brazil since Government personnel there disposed of approximately 250 vehicles a year, or about one per working day; that the Embassy’s previous regulations were directed to certain abuses, such as importing cars as de facto agents for dealers and to obtain compliance with the relevant Brazilian requirements; that “we have had surprisingly good results including general absence scandals and press criticisms * * * despite few extremely annoying cases such as Finks-Willette”; that he was trying to fulfill the Circular’s 'basic purpose of eliminating “bad reflections on U.S. image abroad” resulting from charges of “profiteering through sales of cars imported under diplomatic privileges,” but that, while su'ch “purpose is laudable,” the new proposed regulations “must fit facts of life in local market situation”; that in Brazil, a two- or three-year-old car had a market value of between $500 and $3,000 above cost price “and even further above resale value in U.S.,” but that such prices were not out of line with those of new locally manufactured cars; and that, unless the employees’ cars are “aH compelled to be returned home (which would be unjust *416 to employees and anti-economic), this extra margin will accrue to someone”; and that lie saw
no prospect of [fclie Brazilian Government] revising own regulations or taking on major headaches of potential quarrel with rest of diplomatic corps and/or auto dealers’ fraternity in order constitute a workable system for their capturing the margin. * * *
Some language of [FAMC 281] seems to come down to saying that we tell employees not to sell for more than cost price and then simply leave it between sellers and buyers how this is to be worked out. This would, in my considered judgment, make FAMC 281 completely unenforceable, would open door to every form of extra payment in cash or kind, would in some cases give a wholly unjustified windfall to certain lucky dealers and in other cases lead to true or false charges of corruption and abuse, and would do irreparable damage to U.S. image here as well as to employee morale. Finks/Willette case is good illustration of this. * * * I personally cannot and will not accept responsibility for issuing regulations in that sense. Workable regulations must be uniform in application to employees and leakproof, or whole purpose new policy will be frustrated.
Finally, Ambassador Gordon made the following suggestion:
Only viable solution consistent with letter and spirit of FAMC 281 is to prevent direct dealings between employees and dealers, although not interjecting embassy or agency thereof as formal intermediary who buys and resells. Clearly employee must file quitclaim on excess profits relinquished by him, to avoid subsequent legal complications. Eecipient these funds should not be embassy or USG, but must be some nonprofit institution formed under aegis embassy or USG, and presumably legally resident in U.S., to whom the donation of these funds by the employees would be tax deductible. Begula-tions camiot permit variations in treatment pother than option of returning car home) [without] inviting abuses suggested in Paragraph 3 above.
Summary our new regulations in final stages preparation provides for:
(A) Selection of reputable broker;
(B) Appointment of committee consisting American employees major U.S. Government agencies supervise broker’s activities;
*417 (C) Sellers given choice export or sell through broker;
(D) Establishment nonprofit or charity fund or foundation to be administered by board appointed by ambassador;
(E) Owner desiring sell rather than export would give legal power of attorney authorizing broker sell car and release profits on sales to special fund or foundation;
(F) Seller would give quitclaim on receipt of money for his car and on releasing funds to foundation;
(G) Seller would indicate how profits to be used, indicating by memo his preferred charities, cultural activities and/or scholarships, etc.
The Ambassador asked the Department to reconsider FAMC 281 and requested its reaction to the new regulations he was drafting.
22. In response to Ambassador Gordon’s message, the Department cabled the following reply on April 2,1965:
Department has no objection embassy plan which we understand to be as follows:
1. Establishment of charitable foundation offi-cered by embassy personnel serving in private capacities.
2. Selection reputable and cooperative broker for sale of cars.
8. Seller will have choice of export or sale through broker with understanding employee would receive return allowed under FAMC 281, para. 3d, with excess proceeds paid by broker to f oundation. Power of attorney and quit claim would protect USG.
4. Seller would designate use of excess proceeds. Department concerned this may create tax problem.
5. Foundation would administer disposition of excess proceeds.
Assume local IBS_ will be consulted on all sales and other questions relating to income taxes.
_ * * * No objection employee group acting as foundation or other private capacity.
23. On April 20, 1965, the Department of State issued FAMC No, 281-1, the purpose of which was “to supplement and further explain the requirements of FAMC No. 281 *418 without in any way changing its intended meaning or objective.” The Circular read in part as follows:
2. General Statement
The provisions of FAMC No. 281 were not intended to convey the impression that employees would be forced to sell their property at cost to a dealer or individual who would in turn sell it at the market price and retain the difference. It was intended that embassies would establish regulations compatible with local conditions, which would permit the employee in his discretion to sell his personal property for the price he paid for it plus any •taxes and customs paid by him. If the employee does not desire to dispose of his property locally at cost, the way was left open for the property to be exported under current travel or shipping regulations.
3. Facilitating Plans to Avoid Export of Property
a. To facilitate the handling of property within the intent and purpose of FAMC No. 281, ambassadors may wish to consider the desirability of establishing a charitable foundation or other organizational arrangement, officered by post personnel serving in a private capacity, through which the property can be sold and the excess proceeds managed for charitable purposes. If local.conditions permit and arrangements can be made with a reputable dealer (or dealers through sealed bid or otherwise) to purchase and resell the property under an agreement to turn over the excess proceeds to the foundation, this may be done. If for any reason a dealer agreement is not feasible or desirable under local conditions, consideration may be given to having the charitable foundation itself handle the purchase-resale transaction.
b. If due to local conditions the ambassador determines that the purpose of FAMC No. 281 can be achieved effectively through direct sale by the employee, adequate controls to ensure compliance should be established through employee certification under oath of sale and disposition of excess proceeds if any, and embassy review of related documentation.
4. Cautions in Issuing Local Regulations
In developing local regulations several points should be kept in mind:
a. As an alternative to selling on the local market, the employee may export the property. He should be given the opportunity to exercise this option.
*419 b. If the employee chooses to sell at cost as defined in FAMC No. 281, he should be permitted to do so, provided the embassy is consulted and concludes that the arrangement satisfies the basic purposes of the Department’s policy.
c. To avoid any misunderstanding of the rights and obligations of the parties involved, preferably transfer of title should be consummated through sale of the property by the employee to a designated dealer, or to a foundation, and resale by such purchaser.
d. The need for obtaining a power of attorney or quitclaim from the employee selling the property.
e. The employee’s designation of charitable organizations or institutions to receive the excess proceeds should be honored, but the U.S. tax aspect should be considered.
f. Proceeds of sale should not pass through United States Government accounts. However, there is no objection to handling such proceeds in a non-Government account on an interim basis pending establishment of a charitable foundation or similar arrangement.
g. The locally available IRS office should be consulted on all sales and other questions relating to income taxes.
24. Pursuant to FAMG 281-1, Embassy Instruction No. 188, headed “Transportation, Use and Sale of Personally Owned Motor Vehicles,” was issued by the Embassy at Rio de Janeiro on May 20,1965. Such instruction again set forth the basic policies involved, and the rules and procedures concerning the importation and use of vehicles. It also provided in part as follows:
V. CONDITIONS FOR DISPOSITION OP VEHICLES IN BRAZIL under FAMC 281
A. Options
The owner of a vehicle imported free of duty has the following options in disposing of the vehicle:
(1) Export the vehicle from Brazil, at government expense if eligible;
(2) Sell the vehicle (non-liberated vehicles only) to another person enjoying duty-free privileges;
*420 (3) Pay Brazilian duties and taxes, thus freeing the vehicle for sale subject to approval of Brazilian authorities;
(4) Sale to the Foimdation. The seller will receive only an amount consonant with the provisions of FAMC 281. In such a case the seller will be given a statement by the Foundation which will indicate the exact amount received;
(5) Sale through the Foundation. The seller will receive only an amount consonant with the provisions of FAMC 281. He may designate, if he wishes, the charity to which any excess proceeds are to be paid. The seller will be given a statement by the buyer showing the full amount paid for the vehicle and he may be subject to the payment of a capital gains tax.
B. Foundation
(1) A charitable Foundation will be established to sell or facilitate the sale of vehicles owned by U.S. Government employees enjoying duty-free privileges. The Embassy Automobile Board avIII administer the Foundation, establish the procedure for the sale of vehicles in accordance with the provisions of this instruction, and dispose of the funds received by the Foundation.
(2) Pending the legal establishment of a Foundation, the funds accruing to it from the sales of duty-free vehicles will be placed in escrow in an interest bearing account in a U.S. bank.
YI. BeqotiiemeNts pot, Sale or Vehicles in Beazil
C. Embassy Regulations
$ $ $ ;Jt ❖
(5) No negotiations for the sale of a vehicle, except under option V A (2), shall take place until the Embassy has approved the application and transmitted it to the Brazilian Authorities for their approval.
D. Procedure
■■■.i * * * *
(3) If the seller exercises either of the options set forth in Section V A, paragraphs (2) and (3) above, *421 he can negotiate directly with the buyer of the vehicle. If the seller opts for V A (2), he must file with the Committee a statement that he made no profit in the transaction. If he opts for V A (3) he must obtain the approval of the Embassy and/or JBUSMC, and of the Brazilian authorities to pay the duties and taxes;
(4) If the seller exercises either of the options set forth in Section V A, paragraphs (4) and (£>)., above, he must deal directly with the Foundation, or its authorized representative. In either case, the seller must give the Foundation a quit claim;
(5) If the seller exercises one of the options set forth in Section V A, paragraphs (2), (4) or (5), he must submit with his application for sale acceptable documentary proof of the cost of the vehicle (invoices, receipts, certificates, etc.) ;
‡ ‡ ‡ $
VII. JBUSMC PERSONNEL
Civilian and military personnel assigned to the Joint Brazil-United States Military Commission are eligible for the same privileges, and are subject to the same rules and regulations stipulated herein and shall submit all applications for importations and disposals to or through, as applicable, the Secretary of the United States Delegation, JBUSMC.
The Instruction continued the existence of the Embassy Automobile Board and its provisions, effective immediately, were made applicable to all duty-free vehicles which were eligible for sale after March 1,1965.
25. By Administrative Circular also dated May 20, 1965, the Administrative Officer of the Embassy at Bio de Janeiro, Mr. Sylvain B. Loupe (who, by virture of his position, was also the Chairman of the Embassy Automobile Board), advised all employees that the Ambassador “has approved the appointment of a Foundation Broker and Manager” and that such appointee was expected to assume his duties by May 21, 1965. The Circular also advised that the Embassy Automobile Board was drafting regulations for the sale of motor vehicles “for an amount consonant with the provisions of FAMC 281,” and that new application forms for permission to sell would be available on May 24,1965, when “the wheels *422 will be rolling again. The Automobile Board has removed its foot from your 'brakes. In the meantime, the road has been damaged and your ride is no longer smooth. Also, we are now able to give you information instead of inflammation.”
26. Some Embassies, such as those in Argentina and Colombia, preferred to let the employee handle the sale himself and then certify that the excess profit, 'as defined, had been donated to an approved charity of the employee’s choice, and they therefore chose the alternative suggested by Paragraph 3(b) of FAMC 281-1. This was discretionary with each Ambassador however, and Ambassador Gordon chose to base his regulations on the “broker” approach, as outlined in his previous communications addressed to the State Department and as subsequently authorized for all Embassies by Paragraph 3 (a) of FAMC 281-1.
27. (a) On May 24, 1965, the Automobile Board, by its Chairman, contracted with Mr. Paul H. Goodman, an American citizen residing in Brazil, to serve as the “Administrative Officer” of the Foundation, at a salary of $1,000 per month. The contract provided in part as follows :
2) The Contractor [Mr. Goodman] agrees to provide his. services as Administrative Officer of a Foundation which is being established for the purpose of receiving, using, and distributing for charitable purposes funds from various and sundry sources, principally from the sale and disposition of automobiles entrusted to the Foundation for sale by US Government employees assigned to and serving in Brazil. The Contractor further agrees to act on behalf of the Foundation in all matters relating to the sale and disposition of motor vehicles entrusted to the Foundation except for those processes which by Brazilian law or decree must be handled by the Embassy and/or the owner but including and not limited to the taking of physical possession of such motor vehicles as required; conducting negotiations with potential buyers in order to obtain the best possible market price; preparation and execution of related documents; maintenance of pertinent files and receiving and disposing of funds derived from the sale of such automobiles; subject, in all such actions, to the supervision, direction and review of the Embassy Automobile Board or of its designee or designees.
*423 It was further agreed that Mr. Goodman was not, by virtue of the contract “or of any promise verbal or implied from anyone, an employee of the Government of the United States of America nor of any of its agencies * * Mr. Goodman’s office was located in the United States Embassy in Eio de Janeiro, the contract specifying that the Board should provide him “with office spac8, supplies, clerical or such other assistance as it may deem necessary.” It further provided, however, that “All expenses connected with the provision of office space and clerical or other assistance shall be paid from the Foundation’s account.” His salary was also paid out of Foundation funds.
(b) In a memorandum dated May 27,1965, to the Government employees, Mr. Loupe made the following statement concerning Mr. Goodman, his status, and his functions:
The Foundation Administrative Officer position is nongovernmental. Mr. Goodman, as an employee of the Foundation, works in a private capacity. In addition to administering the affairs of the Foundation, Mr. Goodman as a designee of the Embassy Automobile Board assists with the sale of privately-owned motor vehicles of US Government employees and fulfills other requirements of the Board as directed.
He also sells motor vehicles for government employees choosing options (4) and (5) in Embassy Instruction 188. For sales under options (4) and (5) Mr. Goodman will require from the seller a power-of-attomey document duly authenticated. A certificate of sale and quit claim duly signed by the seller and two witnesses will be required also at the time the seller receives the money from the Foundation Administrative Officer. Employees are reminded again that they do not have to use options (4) and (5) which require the signing of certificates. There are two other options (2) and (3) where the employee does his own selling.
28. (a) A formula for reimbursing owners for their cars disposed of in Brazil was developed by the Embassy Automobile Board and approved by Ambassador Gordon. For automobiles brought into Brazil new (defined as one which was purchased new and which had been in the employee’s *424 possession, one year or less at the time it was shipped to Brazil), reimbursement was based not on the price shown on the sales invoice, but, where the seller paid the TT.S. excise tax, on the manufacturer’s New York domestic list price, plus all accessories, and, where the seller did not pay the excise tax, on the New York FAS list price, plus accessories. Reimbursement also included all sales or title taxes paid in the United States; such costs as marine insurance, preparation charges, custotns fees, port charges, and dock handling ; and all inland and overseas transportation costs.
For vehicles in the employee’s possession for more than a year when shipped to Brazil, the formula provided for list price minus 20 percent where possession was for less than two years, and list price minus 35 percent where possession was for more than two, but less than three ye'ars, with 10 percent additional being deducted for each year of possession over three, up to a total of 85 percent depreciation.
If the highest bid was less than the formula price, the employee had the option of (a) accepting the highest offer; (b) selling the automobile himself on the open market; or (c) exporting it.
At first, freight costs incurred in shipping a second car into Brazil (after the first car had been in Brazil two years) were at the employee’s own expense and were not considered an allowable cost. However, such costs were later allowed by the Foundation on the authority of the State Department. Plaintiffs Artwohl (No. 1), Brown (No. 4), and Jones (No. 11), along with other employees Who had sold a second car Which had been imported at their own expense, were later paid an additional amount to cover their freight costs.
(b) By Administrative Circular, dated May 25,1965, and entitled “Implementation of Embassy Instruction No. 188,” Mr. Loupe advised all employees that the formula price was not based on their invoices, but that “It is doubtful that you will be able to produce invoices that will show that you paid more than the sale of your vehicle will yield through the controlled system. If you do, it will indicate that you were overcharged when you bought it. In other words, you paid *425 more than the domestic list price for it.” The Circular further stated:
The Foundation will not pay any one for the cost of his vehicle plus other allowable items of expenses listed in the pricing formula unless the sale of the vehicle yields at least that. amount. The Foundation will not support the cost price of any vehicle unless the sale of that vehicle yields sufficient funds for it.
The Chairman of the Automobile Board has no funds, staff, supplies, space and all other items necessary to conduct Board business in an expeditious and efficient fashion. This has resulted 'in our having been discourteous to employees with appeals before Board. There has been no time to acknowledge receipt or prepare a reply containing the decision of Board. This situation disturbs us and our apologies are extended to those caught in this trap. In the meantime, any good drafting officer who has a few minutes to spare for a good cause is invited to join this vehicle bedlam and help us cage chaos.
29. Sales of private automobiles were suspended pending the drafting of the new regulations by the Embassy Automobile Board and the employment of a Foundation official to act as a sales broker. Soon after Mr. Goodman’s contract with the Automobile Board was entered into, sales were resumed. The first sale under the new system was completed on May 26,1965.
30. The foundation established pursuant to Instruction No. 188 (hereinafter referred to as the “Foundation”) was at first termed the “American Embassy Foundation,” and was so designated during the period in which plaintiffs’ automobiles were sold, i.e., from May 26,1965 through January 25, 1966. (It was later, i.e., since around August 8, 1966, sometimes referred to as the “American Employees Foundation.”) As provided by Instruction No. 188, the Embassy Automobile Board was charged with the responsibility of administering the Foundation, establishing procedures for the sale of vehicles in accordance with the Ambassador’s instructions, and disposing of funds received by the Foundation. However, the Ambassador or his delegate at times issued orders to Mr- *426 Goodman directly concerning Foundation procedures and practices. For various reasons, the Foundation was never incorporated. It was referred to in the audit reports prepared by Arthur Andersen & Co. as “a non-profit, unincorporated fund.” Automobile owners as such had no membership in or any “membership” relationship with the Foundation. In a memorandum to employees, dated November 10, 1965, Mr. Loupe stated:
We know there are questions pending before the Automobile Board and we know that you are curious about the Foundation. So are we. * * * You will be told all that is known about the Foundation as well as the thinking of the State Department on the subject. * * *
‡ ‡ $
The Board has not issued instructions on our local Foundation because the Department contemplates issuing worldwide instructions on Foundations. As of now, our situation is: a) The Foundation exists in name only; b) the money is held in escrow pending decision on tax issues; and c) the money is on interest bearing deposit to help defray administrative expenses which will permit more of the fund to be used for worthy causes.
In the meantime, the Foundation is buying and selling cars. The pricing formula, though liberal, has the support of the Department.
31. (a) The procedure for obtaining authorization from the Brazilian Authorities remained essentially unchanged. One change was that applications had to be submitted on the new Embassy Form No. 1. This form, entitled “Application To Sell Privately Owned Automobile,” originally listed all of the disposition options provided in Embassy Instruction No. 188 (except exportation under option 1). However, it soon became apparent that Brazilian Customs would not permit the uncontrolled sale of automobiles after payment of import duties by the seller. Accordingly, on June 8, 1965, Form No. 1 was revised to effect the deletion of option 8, and on July 27, 1965, the regulations were changed, by the issuance of “Embassy Instruction 188 Revised,” so as to delete option 3, leaving only the options of “sale to” and “sale through” the Foundation if the employee decided to sell his *427 automobile at the open market price to one not eligible for duty-free importation. The revised application form designated “sale to” tbe Foundation as option 3 and “sale through” the Foundation as option 4, and required the employee to indicate which option he chose to use.
(b) Embassy Form No. 1 also contained, just above the place for the employee’s signature, the 'following:
I hereby choose Option No. - of my own free will. * * *
I hereby renounce any claim against the TJ.S. Government, the Government of Brazil, the Embassy Automobile Board, or any person concerned with the implementation of the regulations governing the sale cf my car, except in the case of fraud or malfeasance.
Each plaintiff herein signed such a form.
(c) When clearance had been obtained from Brazilian Customs, JBUSMC would notify the Foundation, which in turn would notify the seller. When the seller was ready to give up his car for sale, he would take it to the Foundation garage and obtain a receipt. He would then take the receipt, a bill of sale, and his Brazilian registration certificate to Mr. Goodman at the Foundation office. (The registration certificate was obtained at the time the automobile was imported ■and served as a certificate of title under Brazilian law.) Upon receipt of these papers, Mr. Goodman computed the amount which the seller was entitled to receive from the sale proceeds, under the formula approved by the Ambassador. The seller was usually paid the formula price at or shortly after the time he turned in his automobile and the accompanying papers. This was often before the car was sold. Such payment was made after Mr. Goodman had determined that the formula price was lower than the market price.
32. (a) Mr. Goodman effectuated the sale of the automobiles to the highest competitive bidders on the open civilian market. Bequests for bids were placed in newspapers.
(b) At the time he received the payment of the formula price, the seller executed Embassy Form No. 3, entitled “Certificate of Sale and Quit Claim.” On such form the amount (both in cruzeiros and dollars), which the seller received *428 from Mr. Goodman, was indicated. Each plaintiff herein executed such a form.
(c) The form also contained the following provision applicable to sellers who had selected the “sale through” option:
* * * I have instructed that $- be forwarded by the Foundation to certain charities designated by me in a separate document.
The amount was left blank, to be filled in by the Foundation (where sellers had made such designations) after the sale had been made and the proceeds in excess of the formula price had become available.
(d) Further, the form contained the following language just above the place for the seller’s signature:
I accept voluntarily the above dollar amount in cash (or check No. -) which I understand to be consonant with provisions of FAMC 281 issued by the Secretary of State and Embassy Instruction 188, issued by the Deputy Chief of Mission with the approval of the Ambassador, and do hereby release, renounce and quit claim now and forever all and any further claims against the United States Government, the Embassy of the United States of America at Bio de Janeiro and all or any person or organizations connected with this sale.
33. (a) Diplomatic personnel who desired to sell their automobiles duty free on the open market in Brazil were required to comply with all the regulations established by the Ambassador to Brazil, including those requiring the execution of the above-described specified forms. Any modification in the prescribed forms was prohibited by the State Department. In order to obtain the Ambassador’s approval of the sale of his automobile in Brazil, the employee was required to execute authorization for the Foundation to retain the excess proceeds of the sale.
(b) For example, plaintiff John H. Bell (plaintiff No. 2) selected the option to sell through the Foundation. He first submitted, on May 25,1965, an altered Embassy Form No. 1, “Application to Sell Privately Owned Automobile.” He had lined out the words “of my own free will” in the sentence “I *429 hereby choose Option No. 5 of my own free will.” He also lined out the paragraph reading:
I hereby renounce any claim against the U.S. Government, the Government of Brazil, the Embassy Automobile Board, or any person concerned with the implementation of the regulations governing the sale of my car, except in the case of fraud or malfeasance.
Instead, he inserted the following paragraph on the form:
I have chosen Option No. 5 as the more desirable of the options offered to me. I do not choose to willingly agree to being deprived of the profits accruing from the sale of private property until the legality of the present procedure is resolved. For this reason I also decline to sign the last paragraph which would renounce my claim against the United States Government.
(c) By memorandum dated June 7, 1965, to plaintiff Bell, Mr. Loupe stated in part:
Regrettably, the State Department requires the quit claim as a protection for the USG, therefore, the Board could not eliminate this clause from the application.
On June 8, 1965, plaintiff Bell executed the prescribed and unaltered application, and on June 11, 1965, he executed Embassy Form No. 3, “Certificate of Sale and Quit Claim,” without alteration. His two-year-old Chevrolet, having been driven on the roads in Brazil, would have been worth about $800 in the United States. It was sold in Brazil by Mr. Goodman on July 9, 1965, for $7,291.11. From this sum plaintiff Bell was paid $3,671, and the remaining sum of $3,620.11 was retained under the provisions of Embassy Instruction No. 188.
(d) It was generally known that in the execution of the forms no alterations could be made thereon, and that indicating protests thereon was futile.
34. (a) Plaintiffs who selected the option to sell through the Foundation were advised by letter from the Chairman of JBUSMC at the time of receipt of official notification of approval by Brazilian Customs of the sale of their automobiles as follows:
3. Since you have chosen option 5 under the provisions of Embassy Instruction 188 for sale of your privately *430 owned vehicle, a copy of this letter has been forwarded to the Foundation. You may deal directly with the Foundation in order to consummate the sale. You are cautioned however, that since you have elected to sell under the provisions of option 5 of Embassy instruction 188, all negotiations must be conducted with the Foundation as it is the only authorized contact with prospective buyers.
(b) However, insofar as the actual practice and procedure were concerned in effectuating sales, there was no substantive difference between the sale-to and sale-through options. In practice, in either case Mr. Goodman acted only as an intermediary between seller and purchaser rather than as a purchaser-reseller. The Foundation did not take title to the automobile under either option. The automobile continued to be registered in the employee’s name until actually sold to the Brazilian purchaser, at which time title was transferred directly to the buyer.
35. Plaintiffs Artwohl, Diehl, and Garland selected the option of sale to the Foundation. The other plaintiffs selected the sale-through option. The highest purchase price paid by a Brazilian buyer for any of plaintiffs’ cars was $11,132.07; the lowest was $4,749.86. The amounts in excess of the formula prices kept from plaintiffs ranged from $6,518.30 to $1,806.39. All of plaintiffs’ cars were eligible for duty-free sale having been in Brazil two years, and all necessary approvals for such sales had been obtained.
36. All of the plaintiffs who selected the sale-through option refused to designate a charity. The three who selected the sale-to option were not requested to designate a charity at the time their cars were sold. Shortly after the sales had been accomplished, the Foundation advised plaintiffs in writing concerning the purchase prices paid by the respective Brazilian purchasers and the amounts retained by the Foundation to be distributed to charity.
37. Under date of January 21, 1966, Mr. Loupe issued a memorandum to employees entitled “Foundation: Contributions to charities or other organizations,” in which he reminded those using the sale-through option to “designate *431 their own charities” and to indicate the date they desired the contribution to be mailed to the charity by the Foundation, allowing ample time, however, for compliance with “the State Department’s requirement that unknown charities be checked carefully with the Internal Eevenue Service or through other means.” The memorandum further stated:
To date, employees have been slow in requesting the Foundation to make contributions on their behalf, hoping for a change in the regulations. In the meantime, the profits accruing from the sales of vehicles are being held [in an] interest-bearing account in the Chase National Bank of New York City.
Sale-through employees were further advised that they could make contributions to Brazilian charities and cultural institutions, although they were cautioned about income tax problems which could arise if they made donations “to certain categories of Brazal charities.”
38. (a) On February 1, 1966, after all of plaintiffs’ automobiles had been sold, the Department of State issued FAMO 378, entitled “Importation and Sale of Personal Automobiles and Other Personal Property Abroad.” This Circular, which superseded FAMO 281 and 281-1, generally reiterated their provisions and retained the objective of preventing the retention by employees of “excess proceeds,” as defined, on the duty-free sale of property. The provision contained in FAMO 281-1 of April 20,1965, concerning the establishment 'by Ambassadors of a local nongovernment operated charitable foundation was reiterated. One innovation of FAMO 378 was that it permitted the eliminated profits, i.e., the amount by which the sale price exceeded “acquisition cost,” as defined, to be designated for the benefit of all United States Government employees, including those employees who were not entitled to duty-free importation privileges. Another change related to taxes. It was provided that:
When the seller must pay taxes as a result of capital gains and to the extent that he is unable to deduct a charitable contribution made with the excess proceeds, he will be permitted to retain a portion of the excess proceeds equal to 25 percent of the capital gain.
*432 The Circular also contained a “General Tax Guidance Supplement.” The information set forth was developed by the State Department in consultation with the Internal Kevenue Service. On sales “made by the employee above his acquisition cost” and where the excess proceeds were donated to a local charity which had been approved by the Ambassador, but on which the donation was not allowable as a deduction for federal income tax purposes, the seller was permitted to retain 25 percent of the excess proceeds. However, where the excess proceeds were donated to a United States charity, the Supplement advised that “The employee will treat the gain realized on the sale of personal property as capital gain and include this gain in his gross income subject to the applicable limitations,” and that the employee would be “entitled to deduct that portion of the proceeds donated as a charitable contribution * * *.”
(b.) The Circular also provided that “Any locally established employee committee should be alert to possible legal liabilities * * * and should employ such legal, accounting and other services as may be advisable. * * * Proceeds derived from sales should be available for necessary management costs.”
39. (a) At its meeting of March 8,1966, the Embassy Automobile Board considered the establishment of a chartered foundation on the basis of FAMC 3,18, dated February 1, 1966, and FAMC 281-1, dated April 20,1965. Some members felt that “the governing body” should be an entity in the nature of a “sales committee” since FAMC 378 (and similar previous instructions apparently covering the sales period herein involved) provided that all sales of imported personal property could be made only on receipt of written approval of the terms of sale and disposition of excess proceeds “including the ultimate beneficiary thereof, by a sales committee appointed by the Ambassador * * *.” However, others felt that a chartered foundation should be established as authorized by both FAMC 281-1 and 378. Those favoring the “sales committee” approach felt so serving in an ex officio capacity would involve less legal liability than would serving in a private capacity or a chartered foundation. However, although *433 no agreement was reached, it was decided that attempts to secure a charter would continue.
(b) At the same time, the Board also incorporated into its regulations and procedures the tax provisions of FAMC SYS, and “instructed the Foundation Administrative Officer to take action accordingly on sales made through the foundation.”
(c) At the meeting the Board also ruled that 2 percent of the gross sales price should be deducted from each sale for use as operating expenses. The 2 percent was to be deducted from profit after deduction of the formula price and prior to remittances to charities.
40. By memorandum dated March 24,1966, Mr. Goodman advised Kenneth G. Guilfoyle, plaintiff No. 9, that Foundation files showed that automobile prices on duty-free sales had been higher than individuals had received before the issuance of FAMC 281, FAMC 281-1, and Embassy Instruction No. 188. The State Department had not expected the program established pursuant to FAMC 281 and 281-1 to cause prices of automobiles to go down. FAMC 281-1 permitted automobile sales at the going rate.
41. The petition herein was filed on May 11, 1966.
42. Embassy Instruction No. 188 Bevised, dated May 26, 1966, was issued with specific reference to FAMC 378. The Instruction was designed to increase the number of options under Embassy Instruction No. 188 of July 27, 1965, which were available to sellers of personally owned vehicles, and to require that all persons selling vehicles through the Foundation designate the charity to which excess proceeds would be given. The revised “Options” provision was as follows:
V. CONDITIONS For Disposition op Vehicles in Brazil UNDER FAMC 378
A. Options
The owner of a vehicle imported free of duty has the following options in disposing of the vehicle:
(1) Export the vehicle from Brazil at government expense if eligible;
(2) Sell the vehicle (non-liberated vehicles only) to another person enjoying duty-free privileges;
*434 (8) Sale to the Foundation. The seller will receive only an amount consonant with the provisions of FAMC 378. In such a case the seller will be given a statement by the Foundation which will indicate the exact amount received. Proceeds in excess of this amount will be disposed of by the Foundation.
(4) Sale through the Foundation. The seller will receive only an amount consonant with the provisions of FAMC 378 with excess proceeds going to a charitable organization, contributions to which are considered deductible for Federal income tax purposes by the Internal Eevenue Service.
(5) Sale through the Foundation. The seller will receive only an amount consonant with the provisions of FAMC 378 with excess proceeds going to a charitable organization in a country other than the United States, contributions to which are not considered deductible for Federal income tax purposes by the Internal Eevenue Service. Eligibility of these organizations will be determined in each case by the Chief of Mission.
When a seller must pay taxes as a result of capital gains and to the extent that he is unable to deduct a charitable contribution made with the excess proceeds, he will be permitted to retain a portion of the excess proceeds equal to 25 percent of the capital gain.
Note. — Sellers selecting options 4 or 5 must designate the charity to which they want the excess proceeds donated. This designation must be indicated on the application at the time the car is requested to be cleared for sale.
(6) Sale through the Foundation with excess proceeds donated to the Department of State under Section 1021 (a) of the Foreign Service Act of 1946, as amended. Such funds will be accepted by the Ambassador in behalf of the Secretary of State and will be distributed as follows : 40 percent will be retained by the post and used locally for purposes authorized by Section 1021(a) and approved by the Ambassador; 60 percent will be deposited in a central fund to be managed by an inter-agency committee in Washington for authorized uses under Section 1021 (a) on a worldwide basis. Those funds made available to the Embassy through sales under this option will be used for employees’ welfare and recreation programs at the post.
This instruction is effective as of May 27,1966. All other provisions of Embassy Instruction 188 will remain the same.
*435 43. On July 7, 1966, the Embassy Automobile Board met, and after a discussion of the institution of the present lawsuit, decided not to authorize the disbursement of any of the retained portions of the purchase moneys (except for necessary costs of administering the Foundation) until there was a final court determination “as to the legality of the Foundation and disbursement of the money.”'
44. (a) In December 1966, a question arose as to the status of the Foundation with regard to the exercise by sellers of the disposition options under FAMC 378. Under option 2 of Embassy Instruction No. 118, as revised May 26, 1966, the owner of the vehicle imported free of duty, which was as yet “non-liherated,” could sell the vehicle to another person enjoying duty-free privileges. The question relating to the Foundation was concerning its status, if it purchased such a non-liberated car, as a duty-free person.
(b) On December 28,1966, the Embassy Automobile Board determined that the Foundation could not be “considered a ‘duty-free person.’ ” The basis for the determination was that the “Foundation does not actually purchase vehicles even though it advances money but acts only as intermediary between the seller and the buyer and between the donor and donee.” At its meeting of such date, the Board considered a number of problems and again “decided not to distribute designated funds at this time pending guidance from the Department.”
45. (a) The Foundation’s automobile sales activity described above involved the disposal of some 250 automobiles per year. A Report of Audit as of December 31, 1965, with respect to the Foundation, showed a gross income of $483,028 (.“sales of automobiles” totaling $903,030, less “cost of sales” totaling $420,002), with a net income equaling $459,955. No donations to charity were effected by the Foundation during the year.
(b) A similar Report of Audit as of December 31, 1966, showed a gross income for the year of $688,592 (“sales” totaling $1,338,875, less “cost of sales” totaling $650,283), with net *436 income totaling $676,296. Donations to charities during the year totaled $39,749.
46. On April 26, 1967, Embassy Instruction No. 188 was again revised in certain respects. The revisions included the following: (a) deletion of “the option of selling personally owned vehicles to the Automobile Foundation”; and (b) the incorporation of a provision for a 3 percent service charge on the gross price received for any vehicle “to cover Automobile Foundation expenses.”
47. In July and August 1967, Mr. Goodman sent letters to plaintiffs requesting that they designate charities for the excess proceeds resulting from the sale of their automobiles. The letters were sent both to those who had elected the sale-through option, as well as those who had elected the sale-to option. The letter to the three plaintiffs who had chosen the sale-to option (option 3 of Embassy Instruction No. 188, as revised) stated in part:
Because of the attendant difficulties in setting up a complete list of bona fide Brazilian charities and properly investigating them and deciding which among the American charities are most deserving, the Foundation tabes this opportunity of ashing those who chose Option 3 to indicate charities to which they would like donated amounts equal to the excess profits from the sale of their vehicles (less any amount paid to compensate for income tax levies). Charities indicated should show percentages, NOT amounts. Checks to charities which you may choose will be made out in the name of such charities and forwarded to you for distribution.
The letter to the other plaintiffs, all of whom had chosen the sale-through option (option 4 of said Instruction), stated in part:
This option embodies selling your automoble through the Embassy Automobile Foundation and making the choice ourself as to the charities to which these excess profits will be donated.
At the time of departure, however, you did not indicate which charities you had chosen. The Automobile Foundation is not designed to maintain large balances of cash in its accounts and would like to reduce these *437 balances to a more manageable figure by making all donations as soon 'as it possibly can after the sale of the vehicle.
The Foundation takes this opportunity to ask that you send it the names of the charities to which you wish the excess proceeds donated. A check or checks drawn to tifie charities listed will be forwarded to you for distribution. Charities indicated should show percentages, NOT amounts.
It might be pointed out that no income tax donation benefits apply until actual donation occurs.
Plaintiffs either did not reply or responded that they did not wish to make any decision concerning the disposition of the excess proceeds until after the outcome of the present case. None of the plaintiffs herein has elected to designate any charities to receive any part of the balance of excess proceeds resulting from the sale of his automobile in Brazil which was retained by the Foundation. The letters to plaintiffs were written on “American Employees Foundation” stationery but were mailed in official business envelopes of the Foreign Service of the United States of America, with postage and fees paid by the Department of State. All had annexed to them another letter from Mr. Goodman, as Administrative Officer of the Foundation, stating that the Foundation had sold plaintiff’s vehicle and had received full payment, and detailing “a statement of the transaction.” The statement showed the amount received from the sale, the amount that had been paid to plaintiff, the difference between the two figures (which was designated as the “Profit on Sale”), the 2 percent “Service Charge,” and the balance (which was designated as “Available for Charity”).
48. The Foundation maintains the following three bank accounts:
(a) Banco LAB Brasileño 8.A. Accoimt, entitled “U.'S. Embassy Automobile Account”:
This is a cruzeiro checking account into which all receipts from sales are deposited. All payments to Brazilian charities, and any miscellaneous operating expenses of the Foundation are paid from this account. Deposits are made by anyone associated with the Foundation, but withdrawals can be made only by Mr. Goodman.
*438 (b.l Ohase Manhattan Bank Account, in tlie name of the “American Embassy Foundation”:
This is a savings account and is used for deposit of all funds which are kept for any length of time. It is interest bearing and has been referred to by the Embassy as an “escrow” account. Withdrawals from this account are made by two authorized signers. Such signers are the incumbents of the following positions: (1) Administrative Officer, United States Embassy; (2) Military Attaches representative; (3) United States Information Service representative; (4) United States Agency for International Development representative; (5) United States Military Group representative; and (6) Inter-American Geodetic Survey representative. The United States Military Group is simply another designation for the United States Delegation, JBUSMC.
(c) First National Oity Bank of New York Account, also in the name of the “American Embassy Foundation” :
This is a checking account used for paying employees the acquisition cost of their automobiles (i.e., the “formula price”) and for making payments to charities in the United States. Withdrawals from this account are made by Mr. Goodman and one other authorized signer (from the same incumbents as for the savings account).
United States dollars for transmission to the two United States bank accounts are obtained through the sale of cru-zeiros to the United States Disbursing Officer for a Treasury check which is transmitted to the bank for deposit. Such purchases of cruzeiros by the Disbursing Officer were made pursuant to the authority of the Foreign Affairs Manual as in the case of other purchases of cruzeiros from departing employees, the funds involved being considered as belonging to the employees. The Disbursing Officer made the purchase from the American Embassy Foundation upon notification from the Embassy’s Administrative Officer that the amount involved “represents the proceeds from the sale of privately owned vehicles of the following U.S. Government employee (s) * *
49» (a) Had plaintiffs chosen the option of returning their automobiles to the United States at the end of their tours of duty in Brazil, they would have experienced loss of availa *439 bility of the automobiles pending shipment to an American port, as well as certain additional expenses, such as those involved in obtaining release of the automobile at the port. The market values of the automobiles in the United States at the time of their sales in Brazil were substantially less than the amounts plaintiffs were permitted to retain from the proceeds of sale under FAMC 281 and FAMC 281-1, and the implementing directives promulgated by the United States Ambassador to Brazil.
(b) The possibility of selling an automobile at its acquisition cost to another tax-free person was limited. Such a person would normally buy a new oar rather than one that had been driven in Brazil.
(c) Considering the monetary and other factors involved, the most favorable options which diplomatic personnel could, as a practical matter, select were those of sale-to and sale-through the Foundation.
50. Defendant does not claim entitlement to any part of the proceeds of sale of the vehicles that had been owned by plaintiffs on the theory of recoupment or upon any other theory.
51. None of the proceeds from the sales of plaintiffs’ automobiles that were retained by the Foundation have been distributed or expended by the Foundation, except the 2 percent to pay its operating expenses, as hereinabove set forth.
52. In 1967, the Government of Brazil enacted legislation which materially revised the terms and conditions under which privately owned vehicles could be imported into Brazil duty free and later disposed of by sale to individuals not enjoying duty-free privileges. The legislation affected all vehicles imported on and after September 12, 1967. It provided that, in cases where a vehicle had been imported tax-free (the classes of persons entitled to such privilege were restricted), sales after two years could be made to persons not having duty-free privileges provided they paid all duties and taxes. It thus in effect terminated such tax-free sales privilege. In advising the Department of State of this new legislation, the Embassy at Eio de Janeiro stated that “The effect of this legislation will in all probability preclude *440 the possibility of realizing by sale tlie acquisition cost of any vehicle imported into Brazil after” its effective date.
CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which is made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is dismissed.

Commissioner S. R. Gamer’s recommended conclusion of law was that plaintiffs were entitled to recover. While we disagree with that conclusion, the court acknowledges the assistance it has derived from the commissioner’s able opinion and thorough findings of fact.

The Agency for International Development became involved, and the matter was eventually litigated in this court in the case of Finks v. United States, 184 Ct. Cl. 480, 395 F. 2d 999, cert. denied, 393 U.S. 960 (1968).

 Chevrolet purchased for $3,244, sold for $7,000.

 Chevrolet purchased for $2,300, sold for $3 0,494.

 Chevrolet purchased for $3,400, sold for $10,400.

 Chevrolet purchased for $2,856, sold for $6,914.

 Chevrolet purchased for $2,433, sold for $7,200.

 Chevrolet purchased for $2,500, sold for $6,668.

 Ford purchased for $2,100, sold for $9,201.

 OldBmobile purchased for $2,900, sold for $10,500.